USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3-19-09

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - -x

SAMBA ENTERPRISES, LLC,                   :

                 Plaintiff,     :     **OPINION**

     - against -           :     06 Civ. 7660 (DC)

IMESH, INC.,                              :

                Defendant.     :

- - - - - - - - - - - - - - - - - - -x

**APPEARANCES:**        ADVOCATE & LICHTENSTEIN, LLP
                  By:  Jason A. Advocate, Esq.
              780 Third Avenue, Fourth Floor
              New York, New York  10017
              Attorneys for Plaintiff

              MEISTER SEELING & FEIN LLP
                  By:  Jeffrey A. Kimmel, Esq.
                      Racquel Crespi Weintraub, Esq.
              Two Grand Central Tower
               140 East 45th Street, 19th Floor
              New York, New York  10017
              Attorneys for Defendant

**CHIN, District Judge**

        On March 22, 2006, plaintiff Samba Enterprises, LLC
("Samba") and defendant iMesh, Inc. ("iMesh") entered into an
agreement (the "Agreement"), pursuant to which Samba agreed to do
two things.  First, Samba agreed to help iMesh find partners with
which iMesh could bundle software, in exchange for a commission
on any agreements iMesh might enter into (the "bundling
agreement").  Second, Samba agreed to renegotiate, on iMesh's
behalf, an agreement with AskJeeves.com ("Ask"), and in the event
Samba was more successful in the negotiations with Ask than iMesh
had previously been, Samba would receive a commission (the "Ask
agreement").

Samba was successful as to the Ask agreement,
negotiating a significantly more favorable agreement for iMesh.
Ask and iMesh eventually entered into an agreement at the terms
negotiated by Samba.

Samba was also successful as to the bundling agreement,
finding a suitable partner for iMesh in Zango, Inc. ("Zango").
iMesh and Zango subsequently entered into an agreement.

Unbeknownst to iMesh, however, Samba had also entered
into an agreement with Zango under which Samba received a fee for
referring iMesh to Zango.  When iMesh found out about this side
deal, it terminated the Agreement, and refused to pay Samba
commissions for the bundling or Ask agreements.

Samba filed suit, seeking to recover the commissions it
claims it is owed.  iMesh counterclaimed, arguing, inter alia,
that Samba breached a fiduciary duty it owed to iMesh by entering
into the side deal with Zango.  Both parties move for summary
judgment.  For the reasons set forth below, I conclude that Samba
is entitled to a commission for the Ask agreement, but that Samba
is not entitled to a commission for the bundling agreement
because it breached its fiduciary duty in that respect to iMesh.

## BACKGROUND

### A.  Facts

The following facts are drawn from the deposition
transcripts, affidavits, declarations, and exhibits:

Samba is a limited liability company organized under
Nevada law with its principal place of business in Florida.

(Def. Statement ¶¶ 1, 2).[1]  James Schmidt, who owns 99% of Samba, founded the software consulting company in 2005.  (Schmidt Decl. ¶ 2).

iMesh, a Delaware corporation with its principal place of business in New York, is an Internet company headed by Ofer Shabtai and Talmon Marco.  It specializes in the online distribution of media content, primarily music, using a peer-to-peer application and network.  (Def. Statement ¶¶ 3-4; Marco Dep. at 24-25; Shabtai Dep. at 17).

In late 2005 or early 2006, Schmidt learned that iMesh was looking to increase its advertising revenues.  (Schmidt Decl. ¶ 5).  He contacted Shabtai and offered to assist iMesh in finding partners to "bundle" their applications with certain of iMesh's software applications.  (Def. Statement ¶ 11).  iMesh was interested, and on March 22, 2006, Samba and iMesh entered into the Agreement.  (Schmidt Decl. Ex. D (Agreement)).

The Agreement, entitled "Agency Agreement," defined Samba as "Agent" and referred to Samba throughout by that term. It also contained, however, the following provision:

> This Agreement is not intended to create a relationship such as a partnership, franchise, joint venture, agency, or employment relationship.  Neither party may act in a manner which expresses or implies a relationship other than that of independent contractor, nor bind the other party. Without the prior written consent of Company [iMesh], Agent [Samba] shall not make any

---

[1]   Unless otherwise noted, the Court cites defendant's rule 56.1 statement only for facts that plaintiff admitted.

> warranty or representation on behalf of
> Company [iMesh].

(Agreement § 12).

The Agreement had two different components. In the bundling agreement, iMesh "engage[d] [Samba] to act as [iMesh's] non-exclusive Agent to present to [iMesh] various Candidates" with which iMesh could enter into bundling agreements. (Id. § 1). If iMesh and a Candidate entered into an agreement, Samba would receive 1.5% of the total revenue iMesh would receive from that Candidate. (Id. § 3).

In the Ask agreement, Samba was asked to assist iMesh in obtaining a more favorable agreement with Ask. (Id. § 5; Schmidt Decl. ¶ 7). iMesh had previously negotiated with Ask on a deal to include an Ask toolbar on one of iMesh's applications, with iMesh to receive sixty percent of all revenues generated by the toolbar. (Schmidt Decl. ¶ 7). Under the Ask agreement, if Samba could negotiate a deal with Ask that was ten percent better than the deal iMesh already negotiated -- in other words, if Samba could negotiate for iMesh to receive sixty-six percent of revenue from the deal with Ask -- then Samba would receive a 1.5% commission of iMesh's revenue from the Ask deal. (Agreement § 5; Schmidt Decl. ¶ 7).

Samba negotiated with Ask on iMesh's behalf and persuaded Ask to offer iMesh eighty-five percent of all revenues. (Schmidt Decl. ¶ 8; Marco Dep. at 82-83). Samba completed negotiations with Ask in mid-May 2006. (Schmidt Decl. Ex. E (email from Schmidt to Shabtai and Marco indicating negotiations

- 4 -

complete)). On July 21, 2006, iMesh and Ask entered into an agreement incorporating the eighty-five percent revenue-sharing rate Samba had negotiated. (Schmidt Decl. ¶¶ 10-11). In September 2006, iMesh and Ask entered into another agreement which superseded the July 2006 agreement, but also incorporated the eighty-five percent revenue-sharing rate. (Id.).

Samba also attempted to locate Candidates for iMesh with which to enter into bundling agreements. (Id. ¶ 15). In May 2006, after Samba had presented to iMesh a company called Zango, iMesh and Zango entered into an agreement[2] in which Zango agreed to pay iMesh for bundling Zango's software into certain of iMesh's applications. (Id. ¶ 16). Under the terms of this agreement, Zango was required to pay iMesh $1.25 each time a person who downloaded iMesh's application clicked on Zango's software. (Id.). The $1.25 per click amount only applied, however, if iMesh had "US-based installs exceed[ing] 1 million Users." (Schmidt Decl. Ex. L (iMesh-Zango Agreement); Schmidt Decl. ¶ 16).

Unbeknownst to iMesh, however, Samba negotiated a deal with Zango for Samba to receive a referral fee from Zango for introducing iMesh to Zango. (Kimmel Decl. Exs. F, H, J, K (email correspondence between Samba and Zango)). On April 13, 2006, Zango and Samba executed a referral agreement under which Zango

---

[2]     It was actually an iMesh affiliate that entered into the agreement, on iMesh's behalf. (Marco Dep. at 118-19).

agreed to pay Samba five percent of its net profits from the deal with iMesh.  (Schmidt Decl. ¶ 17).[3]

On June 5, 2006, iMesh learned of the existence of the agreement between Zango and Samba, evidently from a conversation with Schmidt.  (Marco Decl. ¶ 4-5 & Ex. E (June 5, 2006 email from Schmidt to Marco and Shabtai referring to "our conversation today")).  While Schmidt claims that he had general discussions with Marco about Samba entering into side deals with candidates, Schmidt never disclosed the existence of the agreement between Samba and Zango before June 5, 2006.  (Id. ¶ 4; Schmidt Decl. ¶ 18).  On June 14, 2006, iMesh terminated the Agreement with Samba, claiming that Samba had breached it by entering into the agreement with Zango, and refused to pay Samba any commissions. (Marco Decl. Ex. G).

**B.  Procedural History**

On September 22, 2006, Samba filed a complaint, invoking the Court's diversity jurisdiction, against iMesh, asserting claims for breach of contract, quantum meruit, and unjust enrichment.  Samba also sought an accounting and a declaratory judgment that Samba has not materially breached the Agreement and is therefore entitled to its commissions.

On November 6, 2006, iMesh answered the Complaint and counterclaimed for breach of contract, breach of fiduciary duty,

---

[3]     Samba has sued Zango regarding a dispute over the referral agreement.  See Samba Enterprises, LLC v. 180Solutions, Inc. and Zango, Inc., No. 06 Civ. 8171 (DC) (S.D.N.Y. filed Oct. 5, 2006).

and fraud.  iMesh also sought an accounting and a declaratory
judgment that iMesh is not obligated to make any payments to
Samba under the Agreement.

The parties engaged in discovery, and these motions
followed.

**DISCUSSION**

iMesh moves for summary judgment as to all of Samba's
claims, arguing principally that by entering into a side deal
with Zango, Samba breached its fiduciary duty owed to iMesh and
therefore is not entitled to any commissions under the Agreement.
Samba, perhaps conceding that it breached the bundling agreement,
argues that the Agreement is divisible and that it did not breach
the Ask agreement.

I begin with a review of the standards applicable to
motions for summary judgment, and New York law on contract
interpretation.  I then discuss whether the Agreement was
divisible, and conclude that it is.  I then address whether Samba
was iMesh's agent under the Agreement.  I conclude that it was,
as a matter of law, and therefore owed a fiduciary duty to iMesh.
With respect to the bundling agreement, I conclude that Samba
breached its fiduciary duty to iMesh when it entered into a side
deal with Zango.  As to the Ask agreement, however, I conclude
that Samba has not breached its fiduciary duty.  Finally, I
consider the viability of Samba's claims for quantum meruit and
unjust enrichment, as well as iMesh's counterclaim for fraud.

- 7 -

## A.   General Standards

### 1.   Summary Judgment

Summary judgment is appropriate if the pleadings,
affidavits, and disclosures that form the record establish that
there is no "genuine issue as to a material fact and that the
movant is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56(c).  Summary judgment should be denied "if the evidence is
such that a reasonable jury could return a verdict" in favor of
the non-moving party.  See NetJets Aviation, Inc. v. LHC
Commc'ns, LLC, 537 F.3d 168, 178-79 (2d Cir. 2008).  In deciding
a motion for summary judgment, the Court must construe the
evidence in the light most favorable to the non-moving party and
draw all reasonable inferences in the non-moving party's favor.
In re "Agent Orange" Prod. Liab. Litig., 517 F.3d 76, 87 (2d Cir.
2008).  The non-moving party cannot, however, "escape summary
judgment merely by vaguely asserting the existence of some
unspecified disputed material facts, or defeat the motion through
mere speculation or conjecture." W. World Ins. Co. v. Stack Oil,
Inc., 922 F.2d 118, 121 (2d Cir. 1990) (internal citations and
quotations omitted).

In deciding a motion for summary judgment, the role of
the Court is not to ask whether "the evidence unmistakably favors
one side or the other but whether a fair-minded jury could return
a verdict for the plaintiff on the evidence presented." Anderson
v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Because the
Court's role is limited in this respect, it may not make factual

- 8 -

findings, determine credibility of witnesses, or weigh evidence.
See Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir.
2005); Hayes v. New York City Dep't of Corr., 84 F.3d 614, 619
(2d Cir. 1996); United States v. Rem, 38 F.3d 634, 644 (2d Cir.
1994).

A court faced with cross-motions for summary judgment
need not "grant judgment as a matter of law for one side or the
other," but "'must evaluate each party's motion on its own
merits, taking care in each instance to draw all reasonable
inferences against the party whose motion is under
consideration.'" Heublein, Inc. v. United States, 996 F.2d 1455,
1461 (2d Cir. 1993) (quoting Schwabenbauer v. Bd. of Ed. of
Olean, 667 F.2d 305, 313-14 (2d Cir. 1981)).

## 2. **Contract Interpretation Under New York Law**

The Agreement contains a choice-of-law provision
designating New York as the governing law, New York has a
reasonable relationship to the Agreement because iMesh is located
in New York, and neither party argues that any other state's law
should apply. (Agreement § 17(b); Def. Statement ¶ 3). The
Court will therefore apply New York contracts law. See Motorola
Credit Corp. v. Uzan, 388 F.3d 39, 51 (2d Cir. 2004) ("[W]here
the parties have chosen the governing body of law, honoring their
choice is necessary to ensure uniform interpretation and
enforcement of that agreement and to avoid forum shopping.");
Finucane v. Interior Constr. Corp., 264 A.D.2d 618, 620, 695
N.Y.S.2d 322, 324 (1st Dep't 1999) (holding that New York

- 9 -

enforces choice-of-law provisions provided that "(a) the law of
the State selected has a reasonable relationship to the agreement
and (b) the law chosen does not violate a fundamental public
policy of New York") (internal citations and quotations omitted).

New York courts interpret contracts "so as to give
effect to the intention of the parties as expressed in the
unequivocal language employed." Breed v. Ins. Co. of N. Am., 46
N.Y.2d 351, 355, 385 N.E.2d 1280, 1282, 413 N.Y.S.2d 352, 355
(1978). A court should not interpret a contract in a manner that
would be "absurd, commercially unreasonable, or contrary to the
reasonable expectations of the parties." Lipper Holdings, LLC v.
Trident Holdings, LLC, 1 A.D.3d 170, 171, 766 N.Y.S.2d 561, 561
(1st Dep't 2003) (internal citations omitted); Mionis v. Bank
Julius Baer & Co., 301 A.D.2d 104, 109, 749 N.Y.S.2d 497, 502
(1st Dep't 2002) ("Courts are obliged to interpret a contract so
as to give meaning to all of its terms. The reason is clear.
Since a contract is a voluntary undertaking, it should be
interpreted to give effect to the parties' reasonable
expectations.") (internal citations omitted).

## B.   Is the Agreement Divisible?

Samba argues that, although the bundling and Ask
agreements are both contained in one single document, there are
really two separate and divisible agreements, and thus Samba
could breach one without precluding recovery on the other. iMesh
disagrees, arguing that the two agreements are integrally

related, and relying heavily on the fact that there is only one document.

While there is no case expressly holding that whether a contract is divisible is a question of law, courts regularly decide the issue as a matter of law. See, e.g., In re Balfour MacLaine Int'l, 85 F.3d 68, 81 (2d Cir. 1996); Lazard Freres & Co. v. Crown Sterling Mgmt., 901 F. Supp. 133, 136-37 (S.D.N.Y. 1995); Christian v. Christian, 42 N.Y.2d 63, 73, 365 N.E.2d 849, 856, 396 N.Y.S.2d 817, 824 (1977). Moreover, the general rule is that unambiguous contracts can be interpreted as a matter of law, and here, as the contract is unambiguous in this respect, the issue of divisibility can be decided as a matter of law. See Mellon Bank, N.A. v. United Bank Corp., 31 F.3d 113, 115 (2d Cir. 1994).

Under New York law, whether a contract is divisible[4] is "a question of the parties' intent, 'to be determined from the language employed by the parties, viewed in the light of the circumstances surrounding them at the time they contracted.'" In re Balfour MacLaine Int'l, 85 F.3d at 81 (quoting Christian, 42 N.Y.2d at 73, 365 N.E.2d at 856, 396 N.Y.S.2d at 824). "Generally, a contract will not be regarded as severable unless (1) the parties' performances can be apportioned into corresponding pairs of partial performances, and (2) the parts of

---

[4] The words divisible and severable are used interchangeably in the case law, and have the same meaning. See Black's Law Dictionary 324 (7th ed. 1999) (noting, in definition of "severable contract": "Also termed divisible contract.").

each pair can be treated as agreed equivalents." <u>Ginett v. Computer Task Group, Inc.</u>, 962 F.2d 1085, 1098 (2d Cir. 1992); <u>Reilly v. Natwest Mkts. Group Inc.</u>, 181 F.3d 253, 266 (2d Cir. 1999) (holding that a divisible contract "'differs from other contracts only in the respect that on performance by one party of each of its successive divisions, the other party becomes liable for his or her performance of that division'" ) (quoting 22 N.Y. Jur. 2d, Contracts § 269 (1996)).

The factors for a Court to consider in determining whether a contract is divisible include whether the parties entered into one or multiple agreements, whether the agreement, in referring to itself, uses singular or plural nouns (e.g., "this Agreement" or "these Agreements"), whether there is a severability clause, whether there is an obvious unit-for-unit transaction, and whether there is a way to determine the consideration for each part of the contract.  <u>See</u> <u>Ginett</u>, 962 F.2d at 1099.

Applying these factors, I conclude, as a matter of law, that the Agreement is divisible.

First, there are two different, independent tasks assigned to Samba under the Agreement:  Negotiate a better deal with Ask, and find other bundling partners for iMesh.  The one does not depend on the other.  The provision of the Agreement engaging Samba to negotiate with Ask made no reference to Samba's engagement to provide candidates, just as the provision of the

Agreement engaging Samba to present iMesh with possible bundling
partners made no reference to Samba's engagement to negotiate
with Ask.

Second, the Agreement contains an express severability
clause.  Section 17(f) of the Agreement provides that the
"invalidity of any provision or provisions of this Agreement
shall not affect any of the other provisions of this Agreement
which shall all remain in full force and effect."  Under New York
law, this is evidence that the parties intended to make the
Agreement divisible.  See Christian, 42 N.Y.2d at 73, 365 N.E.2d
at 856, 396 N.Y.S.2d at 824 ("Here the parties had a right to and
did, by expressly stipulating that if any provision of the
separation agreement be held invalid or unenforceable all other
shall nevertheless continue in full force, make the agreement
within reasonable limits divisible, and there is little room for
construction.").

Third, it is simple to determine the consideration for
each of the two parts of the Agreement.  If Samba negotiated a
revenue-sharing rate with Ask higher than sixty-six percent, then
it was entitled to 1.5% of the revenue iMesh received from the
arrangement.  (Agreement § 5).  If Samba presented bundling
partners to iMesh and iMesh entered into a bundling agreement
with those partners, then Samba was entitled to 1.5% of the
revenue iMesh received.  (Id. § 4).  Nothing in the Agreement

- 13 -

made payment for the Ask agreement contingent on Samba completing the bundling agreement, or vice versa.

While it is true that there is only one Agreement, and that the Agreement only employs singular nouns, to permit these factors to outweigh the compelling evidence suggesting that the parties intended to enter into a divisible contract would permit "form [to] swallow substance."  Sutton v. E. River Sav. Bank, 55 N.Y.2d 550, 555, 435 N.E.2d 1075, 1078, 450 N.Y.S.2d 460, 463 (1982).  Accordingly, I conclude that the Agreement is divisible.

## C.   Does Samba Owe iMesh A Fiduciary Duty Under the Agreement?

iMesh argues that Samba was its agent and therefore owed it a fiduciary duty.  Samba argues that the possibility of an agency relationship is foreclosed by Section 12 of the Agreement, which expressly provides that the Agreement gives rise only to an independent contractor relationship.

The existence of an agency relationship is a mixed question of law and fact that should generally be decided by a jury.  Cabrera v. Jakabovitz, 24 F.3d 372, 385-86 (2d Cir. 1994).  Where, however, the facts are insufficient to support a finding of agency or the facts are not in dispute, the question of agency can be resolved as a matter of law.  Id.; accord 3 C.J.S. Agency § 547 (1973) ("[A]gency is a question of law for the court where the material facts from which it is to be inferred are not in dispute, the question of agency is not open to doubt, and only

one reasonable conclusion can be drawn from the facts in the case."). Here, because there is only one reasonable conclusion that can be drawn from the facts, the Court can resolve the question of agency as a matter of law.

Under New York law, an agent has fiduciary obligations to its principal. See Sokoloff v. Harriman Estates Dev. Corp., 96 N.Y.2d 409, 416, 754 N.E.2d 184, 189, 729 N.Y.S.2d 425, 430 (2001); Ross v. FSG PrivatAir, Inc., No. 03 Civ. 7292 (NRB), 2004 U.S. Dist. LEXIS 16157, at *23 (S.D.N.Y. Aug. 16, 2004). Thus, to determine if Samba owes a fiduciary duty to iMesh, the Court must determine if Samba was iMesh's agent.

"Agency is a legal relationship between a principal and an agent. It is a fiduciary relationship which results from the manifestation of consent of one person to allow another to act on his or her behalf and subject to his or her control, and consent by the other so to act." Maurillo v. Park Slope U-Haul, 194 A.D.2d 142, 146, 606 N.Y.S.2d 243, 246 (2d Dep't 1993) (citing Restatement [Second] of Agency § 1); Cabrera, 24 F.3d at 386.

Here, it is undisputed that both parties manifested their intent to have Samba act on iMesh's behalf by entering into the Agreement, which provides that iMesh "engages [Samba] to act as [iMesh's] non-exclusive Agent." (Agreement § 1). The Agreement is entitled, "Agency Agreement," and defines Samba as "Agent." Section 13 of the Agreement also provides that "[iMesh], in its sole unfettered discretion, shall decide whether

- 15 -

or not it wishes to enter into an agreement with any Candidate and the terms of such agreement." Section 5 of the Agreement provides that, even if Samba negotiates a favorable deal with Ask, it will be up to iMesh whether it wants to enter an agreement with Ask. Thus, Samba was always at iMesh's "direction and control" -- a fact that has been characterized as "an essential characteristic of an agency relationship." Sty-Lite Co. v. Eminent Sportswear Inc., No. 01 Civ. 3320 (CBM), 2002 U.S. Dist. LEXIS 119, at **9-10 (S.D.N.Y. Jan. 4, 2002).

Samba's counterargument, of course, is that the Agreement explicitly provides that it can only give rise to an independent contractor relationship, and that it is not intended to create a "partnership, franchise, joint venture, agency, or employment relationship." (Agreement § 12 (emphasis added)). Indeed, the next sentence provides that "[n]either party may act in a manner which expresses or implies a relationship other than that of independent contractor, nor bind the other party." (Id.).

No reasonable jury, however, could find that this provision precludes the existence of an agency relationship. First, to the extent that Section 12 provides that the Agreement is not intended to create an agency relationship, the provision is inconsistent with the overall purpose of the Agreement, which was to engage Samba to act on iMesh's behalf -- as its agent. Second, the provision is inconsistent with express language in the Agreement, including the title, indicating that Samba was

being engaged as iMesh's agent.  Third, it is apparent that
Section 12 was intended to limit Samba's ability to bind iMesh to
others.  Finally, extrinsic evidence[5] belies Samba's current
contention that it was never iMesh's agent.  On March 20, 2006,
Schmidt sent an email to a computer-industry email list in which
he identified Samba as "the software agent for" iMesh and
solicited bids for partnering with iMesh.  (Kimmel Decl. Ex. G).
On March 27, 2006, Schmidt sent an email to another potential
bundling partner for iMesh in which he wrote, "I have been
retained as agent by imesh to setup [sic] all of their revenue
partnerships."  (Id. Ex. I).  In light of the compelling evidence
that the parties intended to create an agency relationship, no
reasonable jury could conclude that Samba was not iMesh's agent.
Because Samba was iMesh's agent, it owed iMesh fiduciary duties
under New York law.

     Having determined that the Agreement is divisible and
that Samba was iMesh's agent under the Agreement, I now address
the bundling agreement and the Ask agreement in turn.

**D.  Did Samba Breach the Bundling Agreement?**

     iMesh argues that Samba breached the bundling aspect of
the Agreement in two respects.  First, it argues that Samba

---

     [5]     The Court may consider extrinsic evidence in
interpreting a contract that contains internal inconsistencies.
Fed. Ins. Co. v. Ams. Ins. Co., 258 A.D.2d 39, 43, 691 N.Y.S.2d
508, 512 (1st Dep't 1999) ("Where, as here, there are internal
inconsistencies in a contract pointing to ambiguity, extrinsic
evidence is admissible to determine the parties' intent.").

breached its fiduciary duty when it entered into an agreement
with Zango without iMesh's knowledge or consent. Second, iMesh
argues that Samba breached Section 14 of the Agreement, which
provides that the services Samba performs under the Agreement
shall be performed exclusively for iMesh. I conclude, as a
matter of law, that Samba breached its fiduciary duty when it
entered into an agreement with Zango, and do not consider iMesh's
alternative argument.

Samba was iMesh's agent. The New York Court of Appeals
has described the duty an agent owes to its principal as follows:

> Agents must act in accordance with the
> highest and truest principles of morality
> and, as fiduciaries, are forbidden from
> engaging in many forms of conduct permissible
> in a workaday world for those acting at arm's
> length.

Sokoloff, 96 N.Y.2d at 416, 754 N.E.2d at 189, 729 N.Y.S.2d at
430 (internal citations and quotations omitted). Because the
duty an agent owes to its principal is so exacting, "[a]n agent
must not seek to acquire indirect advantages from third persons
for performing duties and obligations owed to his principal."
Brenmer Indus., Inc. v. Hattie Carnegie Jewelry Enters., Ltd., 71
A.D.2d 597, 597, 418 N.Y.S.2d 416, 417 (1st Dep't 1979); accord
TPL Assoc. v. Helmsley-Spear, Inc., 146 A.D.2d 468, 470, 536
N.Y.S.2d 754, 757 (1st Dep't 1989) ("An agent is charged with a
duty of loyalty and may not have interests in the subject
transaction which are adverse to those of his principal.").

- 18 -

Here, not only did Samba, without iMesh's knowledge or consent, contract with Zango to receive a payment for performing a duty Samba was required to perform for iMesh, but Samba's interest in the transaction was adverse to iMesh's.  Under Samba's agreement with Zango, Samba would receive five percent of the net profits Zango received from the deal with iMesh.  Thus, if Zango's fee to iMesh decreased, then Samba's cut increased (because the less money Zango had to pay iMesh, the greater Zango's profits).  Samba thus had a conflict of interest with its principal, it failed to disclose this conflict to iMesh, and it is therefore liable for breach of fiduciary duty.  See Sokoloff, 96 N.Y.2d at 416, 754 N.E.2d at 189, 729 N.Y.S.2d at 430; Renz v. Beeman, 589 F.2d 735, 745 (2d Cir. 1978).

The law in New York is clear that where an agent breaches his fiduciary duty owed to a principal, he is not entitled to receive any compensation under the agreement creating the agency relationship.  See Phansalkar v. Andersen Weinroth & Co., L.P., 344 F.3d 184, 200 (2d Cir. 2003) ("'One who owes a duty of fidelity to a principal and who is faithless in the performance of his services is generally disentitled to recover his compensation, whether commissions or salary.'") (quoting Feiger v. Iral Jewelry, Ltd., 41 N.Y.2d 928, 928, 394 N.Y.S.2d 626, 626, 363 N.E.2d 350, 351 (1977)).

In addition, the agent must disgorge any profits made as a result of his breach.  See Sokoloff, 96 N.Y.2d at 416, 754

N.E.2d at 189, 729 N.Y.S.2d at 430 ("If 'an agent receives anything as a result of his violation of a duty of loyalty to the principal, he is subject to a liability to deliver it, its value, or its proceeds, to the principal.'") (quoting Restatement (Second) Agency § 403); United States v. Miller, 997 F.2d 1010, 1018 (2d Cir. 1993) ("It is settled law that an agent owes his principal a duty of loyalty, and must account for any profits realized in connection with his representation of the principal."); 212 Inv. Corp. v. Kaplan, 16 Misc. 3d 1125A, 1125A, 847 N.Y.S.2d 905, 905 (Sup. Ct. 2007) ("The law is clear that disloyal fiduciaries must disgorge all wrongful benefits obtained by their disloyalty, including compensation and interest."). The reason courts require disgorgement is rooted in policy:

> [T]he function of [a claim for breach of fiduciary duty], unlike an ordinary tort or contract case, is not merely to compensate the plaintiff for wrongs committed by the defendant but, as this court declared many years ago, "to prevent them, by removing from agents and trustees all inducement to attempt dealing for their own benefit in matters which they have undertaken for others, or to which their agency or trust relates."

Diamond v. Oreamuno, 24 N.Y.2d 494, 498, 248 N.E.2d 910, 912, 301 N.Y.S.2d 78, 81 (1969) (quoting Dutton v. Willner, 52 N.Y. 312, 319 (1873)). Here, because Samba breached the fiduciary duty owed to iMesh, not only is Samba not entitled to receive any compensation from iMesh, but Samba must disgorge to iMesh any profits it receives from the agreement Samba entered into with Zango.

**E.   Did Samba Breach the Ask Agreement?**

It is undisputed that Samba negotiated with Ask on
iMesh's behalf and, by obtaining an eighty-five percent profit-
sharing arrangement, satisfied the terms of the Ask agreement.
Nonetheless, iMesh refuses to pay Samba a commission, arguing
that Samba breached the Ask agreement in two respects.  First, it
argues that Samba breached its fiduciary duty with respect to the
entire Agreement and therefore Samba is not entitled to any
compensation.  Second, it argues, based on its interpretation of
the Agreement, that Samba is not entitled to a commission because
the contract between iMesh and Ask was executed after iMesh
terminated its agreement with Samba.

**1.   Did Samba Breach Its Fiduciary Duty With Respect to the
Ask Agreement?**

As discussed above, Samba was iMesh's agent under the
Agreement, and Samba breached its fiduciary duty with respect to
the bundling agreement.  That fact alone, however, does not mean
that Samba cannot be entitled to compensation for work performed
under the Ask agreement, which is divisible from the bundling
portion of the Agreement.  See Musico v. Champion Credit Corp.,
764 F.2d 102, 114 (2d Cir. 1985) (holding that "defendants'
breach of [fiduciary] duty in the present case did not extend to
or taint all the dealings between the parties"); Restatement
(Second) of Agency, § 456 cmt. b ("If an agent is paid . . .
compensation apportioned to the completion of specified items of

work, he is entitled to receive the stipulated compensation for
. . . items properly completed before his renunciation or
discharge."). The question, therefore, is whether Samba breached
its fiduciary duty with respect to the Ask agreement.

There does not appear to be any claim that Samba did.
iMesh does not claim, for example, that Samba entered into a side
deal with Ask, withheld information, or behaved in any way
inconsistent with its fiduciary duties with respect to the Ask
agreement. Indeed, it is undisputed that Samba negotiated a
better deal with Ask for iMesh.

## 2.    **Is Samba Precluded From Collecting a Commission**

### **Under Section 4 of the Agreement?**

It is undisputed that iMesh terminated the Agreement
with Samba on June 14, 2006, and that iMesh and Ask entered into
an agreement on July 21, 2006 that incorporated the eighty-five
percent revenue-sharing rate Samba had negotiated.[6]  iMesh
argues, relying on Section 4 of the Agreement, that because the
contract was signed after iMesh terminated the Agreement, it is
not required to pay Samba a commission. Section 4 provides, in
relevant part, as follows:

> With respect to any Candidates presented by
> [Samba] to [iMesh] during the term hereof,
> unless known to [iMesh] prior to the date of
> this Agreement, if [iMesh] shall enter into a

_____

[6]    iMesh and Ask entered into another agreement in
September 2006 that superseded the July agreement but similarly
incorporated the 85% revenue-sharing rate.

> contract for distribution of Candidates (or
> its affiliates) Distribution Application
> within six (6) months after the termination
> hereof and such contract results in revenue
> received or owed to Company, a commission
> shall be due hereunder.

Section 4, known as a tail provision, is intended to permit Samba
to recover a commission it earns even if iMesh and a Candidate
enter into a contract after Samba and iMesh terminate their
Agreement. Although Section 4 on its face appears to only apply
to the bundling agreement, iMesh argues that it also applies to
the Ask agreement and that, because Ask was "known" to iMesh
prior to the Agreement -- a fact not in dispute -- Samba is not
entitled to a commission on the deal, because iMesh and Ask
signed the agreement after iMesh terminated the Agreement.

Samba argues, citing Section 5 of the Agreement, that
Section 4 does not apply to the Ask agreement. Section 5 deals
generally with the deal with Ask, and the last sentence provides
as follows: "All other Candidates which are not disclosed in
Section 5 shall conform to the standard terms of this agreement."
Samba argues that the implication of this sentence is to exempt
the Ask agreement from the condition, set forth in Section 4,
that Samba can only receive a tail commission when iMesh
contracts with an entity that was not "known" to iMesh before it
entered into the Agreement with Samba. I agree, because this is
the only reading of the Agreement that makes sense.

iMesh argues that the following would be permissible
under its reading of the Agreement: iMesh contracts with Samba

for Samba to negotiate a deal with Ask on iMesh's behalf; Samba negotiates with Ask and obtains an exceptionally favorable result; iMesh terminates its agreement with Samba; the day after terminating its agreement with Samba, iMesh enters into an agreement with Ask at the Samba-negotiated rate; iMesh owes Samba nothing.

This construction of the Agreement is inconsistent with the well-established rule that the Court should not interpret a contract such that the result would be "absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties." Lipper Holdings, LLC, 1 A.D.3d at 171, 766 N.Y.S.2d at 561 (internal citations omitted). When Samba signed the Agreement, it knew that Ask was "known" to iMesh -- the Agreement says so. It would make no sense for Samba to have signed the Agreement if it thought iMesh would be able to reap the benefits of Samba's efforts to negotiate with Ask without compensating Samba merely by waiting to sign the agreement with Ask until Samba was out of the picture. Accordingly, Samba is entitled to its commission on the Ask agreement.

## F. Do Samba's Claims for Quantum Meruit and Unjust Enrichment Survive?

New York law is clear that a party cannot recover under quantum meruit or unjust enrichment where there is a valid and enforceable written contract. See Goldman v. Metro. Life Ins. Co., 5 N.Y.3d 561, 572, 841 N.E.2d 742, 746, 807 N.Y.S.2d 583,

587 (2005) (holding that "there was no unjust enrichment because
the matter is controlled by contract"); Valley Juice Ltd. v.
Evian Waters of Fr., Inc., 87 F.3d 604, 610 (2d Cir. 1996)
("Under New York law, 'the existence of a valid and enforceable
written contract governing a particular subject matter ordinarily
precludes recovery in quasi contract for events arising out of
the same subject matter.'") (quoting Clark-Fitzpatrick, Inc. v.
Long Island R.R. Co., 516 N.E.2d 190, 193, 70 N.Y.2d 382, 388,
521 N.Y.S.2d 653, 656 (1987)); Sheiffer v. Shenkman Capital
Mgmt., 291 A.D.2d 295, 295, 737 N.Y.S.2d 609, 610 (1st Dep't
2002) ("[T]he existence of a valid and enforceable written
contract governing the disputed subject matter precludes
plaintiffs from recovering in quantum meruit."). Here, there is
no dispute as to the existence of a valid and enforceable written
agreement, and iMesh's motion for summary judgment dismissing the
claims for quantum meruit and unjust enrichment is therefore
granted.

## G. Does iMesh's Fraud Counterclaim Survive?

iMesh has counterclaimed for fraud, arguing that it has
suffered damages in excess of $2 million on the deal with Zango
because Samba fraudulently withheld information from iMesh.
Specifically, iMesh argues that Schmidt knew, based on
discussions with Zango and his industry knowledge, that the way
Zango determined what constituted a "user" differed from iMesh's
understanding, and that, as a result, iMesh would never generate

the one million users needed to obtain a premium rate under the terms of the agreement iMesh signed with Zango. Samba moves for summary judgment as to iMesh's counterclaim, arguing that iMesh has adduced no evidence to support its fraud claim.

To succeed on a cause of action for fraud under New York law, iMesh must prove the following elements: (1) the representation of a material fact; (2) falsity of that fact; (3) scienter; (4) deception; and (5) injury. New York Univ. v. Cont'l Ins. Co., 87 N.Y.2d 308, 318, 662 N.E.2d 763, 769, 639 N.Y.S.2d 283, 289 (1995). Even assuming iMesh could prove the first four elements, there is no injury here, because the evidence establishes that, even if iMesh's understanding as to how to count users governed, there were still not one million of them in any given month.

On July 20, 2006, Zango's executive vice president for business development sent an email to Marco and Shabtai in which he wrote as follows: "The agreement we have in place with you has a quota provision of 1 million US users monthly. By any measure (yours or ours) the install counts have remained significantly lower than that target." (Schmidt Decl. Ex. Q). On July 29, 2006, the same Zango executive sent Marco an email in which he wrote that the issue "is volume." (Id. Ex. R). "[E]ven with your numbers," he wrote, "the run rate is far short of 1M US installs per month." (Id.). The only evidence iMesh adduces to prove damages is Marco's deposition testimony indicating that it was "possible" or "conceivable" that iMesh had more than one

million users, based on iMesh's count. (Marco Dep. at 144). Marco conceded, however, that iMesh never pursued the argument with Zango. (Id. at 147-51). The testimony is speculative, and therefore insufficient to defeat summary judgment.

Thus, even if iMesh's understanding as to how users are calculated had controlled, iMesh still would not have had enough users to entitle it to the higher payment rate from Zango. Because iMesh suffered no damages, it cannot sustain a cause of action for fraud. See Salles v. Chase Manhattan Bank, 300 A.D.2d 226, 229, 754 N.Y.S.2d 236, 239 (1st Dep't 2002) (affirming dismissal of fraud claim where "[plaintiff] had no damages resulting from [defendant's] alleged fraud"); Tenenbaum v. Gibbs, 27 A.D.3d 722, 723, 813 N.Y.S.2d 155, 156-57 (2d Dep't 2006) (same).

## CONCLUSION

For the foregoing reasons, the parties' motions for summary judgment are denied in part and granted in part. The parties shall appear for a pretrial conference on April 8, 2009 at 10:00 a.m. in Courtroom 11A.

SO ORDERED.

Dated:    New York, New York
          March 19, 2009

DENNY CHIN
United States District Judge

- 27 -